IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiffs,<br><br>　vs.<br><br>MICHAEL H. MELCHIOR, AND PEGGY A. BRENNAN,<br><br>　　　　　　Defendants. | 4:16CR3033<br><br>**FINDINGS, RECOMMENDATION, AND ORDER** |

　　　　Defendants Michael Melchior and Peggy Brennan have moved to suppress all evidence obtained during a vehicle search conducted on February 18, 2016, all evidence obtained as fruit of the alleged illegal vehicle search, and any statements made during the traffic stop. (Filing Nos. 57 & 74). For the following reasons, Defendants' motions should be denied.

STATEMENT OF FACTS

　　　　After hearing extensive testimony and reviewing the documentary, audio and video evidence, the undersigned magistrate judge finds the following facts are credible.

　　　　On the morning of February 18, 2016, Deputy Jason Mayo of the Lancaster County Sheriff's Office was observing westbound traffic on Interstate 80. His vehicle was parked in the median at a slight angle and facing the oncoming traffic. As an RV approached, Mayo used a stopwatch and determined the RV was following only .75 seconds behind another vehicle at a speed of approximately 60 miles per hour. The gap between the vehicles was far closer than the distance needed to comply with the three-second rule enunciated in the Nebraska Driver's Manual guidelines. Mayo believed the RV driver was following too closely in violation of Nebraska law.

When the RV passed, Mayo saw a male driver wearing a yellow reflective vest, with a female in the RV's passenger seat. Mayo recorded the license plate number and upon checking it, learned the vehicle was registered in Ukiah, California. The Ukiah area is known to law enforcement, including Mayo, as the "Emerald Triangle" because of the large quantity of marijuana produced there. In the three months prior to stopping Defendants' vehicle, Mayo had participated in two other traffic stops associated with Ukiah, California and involving large amounts of marijuana or U.S. currency. Mayo decided to follow the RV and conduct a traffic stop for following too closely.

While catching up with the RV, Mayo observed it had moved into the left-hand lane to pass a semi truck. Another semi was in front of the RV, and a third semi was behind the RV. Mayo clocked .59 seconds of time between the back of the lead semi and front of the RV, with the vehicles traveling 70 miles per hour. After the RV returned to the right-hand lane, Mayo initiated a traffic stop for following too closely. A recording from the video camera in Mayo's cruiser shows the events beginning 30 seconds before his cruiser lights were activated. Although the video recording did not capture the original infraction for following too closely, it does depict the RV following closely behind the semi in the passing lane immediately prior to the stop.

After the RV stopped, Mayo approached the passenger side of the vehicle to speak with the RV's occupants. The driver, Melchior, was very agitated. Within the first 30 seconds of the stop, he mentioned a series of articles in The Washington Post discussing unconstitutional traffic stops. Mayo was aware of the referenced articles and knew they discussed the legality of asset forfeitures arising from vehicle stops. Mayo had never had a motorist raise these issues before: In his experience, the only people who had knowledge of asset forfeiture laws were law enforcement officers, lawyers, and people involved in criminal activity.

Mayo asked Melchior for his driver's license, vehicle registration, and insurance card. When Melchior handed Mayo the vehicle registration and insurance card, the documents were in a plastic vacuum and heat sealed package, like that used for trafficking drugs and money. ([Filing No. 96 at CM/ECF p. 111](#)).

Mayo asked Melchior to sit with him in the police cruiser while the officer completed a warning for following too closely. When Melchior exited the RV, Mayo radioed Deputy Jason Henkel and requested backup due to Melchior's demeanor. Henkel arrived during the course of the traffic stop, along with his canine, Sacha.

While walking back to Mayo's cruiser, Mayo asked Melchior if he had any weapons on his person. Melchior placed his pocket knife on the hood of the cruiser. Mayo asked if Melchior had any other weapons. Melchior did not respond and continued walking toward the cruiser. Mayo stopped Melchior and asked him again if he had any weapons. Mayo noticed Melchior's left coat pocket appeared weighed down. Mayo performed a pat search and felt what he believed from his training and experience to be multiple cell phones in the pocket. When Mayo asked if there were weapons in the pocket, Melchior partially withdrew a smart phone and a flip phone, then dropped them back into the pocket. Mayo believed there may have been additional phones in the pocket. From his experience, Mayo knows that people involved in criminal activity often carry multiple cell phones and use inexpensive flip phones (known as "burner phones") to conduct business.

While in the cruiser, Mayo and Melchior talked about Melchior's travel plans. Melchior informed Mayo that he and his long-time girlfriend, Defendant Brennan (who was in the RV's passenger seat) had travelled to look at a motorcycle in Michigan, went to Florida to visit Brennan's family, and were now returning home to California. As Mayo and Melchior chatted about the ease of traveling across the country in an RV,

Mayo noticed Melchior's answers were contradictory. When Mayo commented that RVs work well for cross-country trips, Melchior responded "I prefer to fly but Peggy doesn't like to drive." (Exh. 1 at 10:35:11). When Mayo stated they likely saved money because they could stay in the RV, Melchior responded that they stayed in hotels. Based on these answers, Mayo could not understand why Melchior and Brennan were traveling in an RV.

Mayo returned to the RV to check the vehicle identification number ("VIN"). He spoke with Brennan and asked her where they had travelled during the trip. Brennan stated they traveled to visit Melchior's mother in Indiana. Mayo asked her if they travelled anywhere else other than Indiana. Brennan responded "No." (Exh. 1 at 10:43:38).

Mayo returned to his cruiser to complete the traffic stop, including preparing a warning ticket and checking on the vehicle's registration, Melchior's drivers license, and Defendants' criminal history. Melchior's license and the vehicle's registration were reported to be valid. Once the warning ticket was prepared, Mayo handed the ticket to Melchior along with his license, vehicle registration, and insurance card. Mayo then asked Melchior if he was willing to answer a few more questions. Melchior responded in the affirmative.

Mayo asked Melchior if there were "500 bazookas in the car." Mayo intended the question to be a light-humored but Melchior's agitation returned and he responded "no, none." Mayo then asked Melchior "you don't have 8,000 kilos of cocaine, correct?" Melchior responded, "no kilos, no drugs, no money." Mayo found Melchior's answer to be odd: Melchior was not asked about money in the vehicle. (Exh. 2 at 12:19). Mayo asked for consent to search the vehicle. Melchior refused consent. When Mayo asked why, Melchior became angry and began shouting. Melchior stated "get a dog, if the dog

4

comes positive, I'll do it." Upon hearing this, Mayo contacted Henkel, who had arrived on the scene minutes before the warning was issued (exh. 2 at 10:40), to deploy his drug dog, Sacha.

Mayo then responded to Melchior, "okay, he's running the dog right now." (Exhibit 2 at 12:57-13:10). A few seconds later, Melchior asked "when can I go?" Mayo stated the dog was being deployed around the vehicle and stated he believed Melchior told him it was alright to run the dog around the vehicle. Melchior adamantly stated he did not provide consent for the dog sniff. Regardless, Mayo believed he had a reasonable suspicion of criminal activity and the sniff continued.

Henkel and Sacha have been an certified drug dog team since 2012, and they have been successfully tested and re-certified every year since. The yearly re-certification prior to Defendants' traffic stop occurred in October of 2015. (Exhs. 3 & 4). Sacha received an overall score of 2.3[1] for searching and 2.5 for indicating based upon 10 test searches. (Exh. 4) On the specific test search involving the exterior of an automobile, Sacha scored a 2 for both searching and indicating. Sacha is trained and certified to detect four types of narcotics: marijuana, methamphetamine, cocaine, and heroin. In addition to yearly training and certification, Henkel and Sacha train once a week in a wide variety of environments and scenarios, using amounts of drugs ranging from large quantities to trace amounts and residue. Sacha's training includes performing canine sniffs on both circulated and uncirculated currency to make certain she does not alert to the presence of currency alone.

---

[1] NSP scoring for drug dog teams is as follows:
1.00-1.74 Superior;
1.75-2.49 Commendable;
2.50-3.24 Typical;
3.25-4.00 Suitable;
4.01-5.00 Improvement Needed; and
5.01-6.00 Unsatisfactory. (Exh. 4).

5

When conducting a dog sniff, Henkel uses the command "gift" to instruct Sacha to begin. Henkel then guides Sacha through a sniff by pointing or "presenting" to parts of the vehicle, and by metering her (turning her in a small circle) to sniff an area he believes was missed. Sacha and Henkel circle around vehicles three times. First sniffing low, then at mid-level, and finally high on individual passes. Henkel will end the search if Sacha does not alert and indicate during the three passes, or when she indicates to the odor of narcotics.

Henkel and Sacha began the sniff of Defendants' RV at the back passenger side, then circled the vehicle moving counter clockwise. While moving along, Henkel directed Sacha by touching along the bottom of the vehicle. During the first pass around the vehicle, Sacha alerted[2] to the presence of drugs at the driver's side door by turning away from Henkel and "sniffing intensely" with "deep nasal breaths" along the door's seam. ([Filing No. 89 at CM/ECF p. 43](#)). The second time around the vehicle, Sacha alerted again at the driver's door by taking deep nasal breaths at the bottom of the door seam. Henkel testified that Sacha then indicated to the odor of narcotics using her indicating behavior, sitting and looking at the source of the odor. Henkel and Sacha moved to the back of the RV, and Henkel signaled to Mayo that Sacha had indicated to the odor of narcotics.

After Sacha's indication, Mayo brought Brennan back to his police cruiser. Other officers arrived at the scene and began searching the RV. They found five or six duffel bags containing heat-sealed currency in the RV's toy hauler and an additional $15,000 in

---

[2] Henkel and Defendant Melchior's expert witness used different terminology to describe a drug dog's behavior. For the purposes of these findings and recommendations, the undersigned magistrate judge adopts the following terminology: An "alert" describes a drug dog's spontaneous change in behavior when it has smelled a drug odor it was trained to detect, while an "indication" is the trained behavior the dog exhibits when it identifies (in this case, but sitting and staring) the location of the strongest scent (and likely source) of the drug odor.

U.S. currency which was heat-sealed and hidden in a bag on a couch near the RV's middle seat. After officers found the currency, Henkel returned to the police cruiser, handcuffed Melchior and Brennan, and read them their Miranda rights.

When the search was complete, the money found within the RV was taken to West Gate Bank to be counted. At the bank, Henkel first conducted a canine sniff in the rooms where the counting was to take place. Sacha did not alert or indicate. Henkel then returned Sacha to his cruiser and the currency seized during the RV search was brought into the bank. Henkel then conducted a second canine sniff in the counting rooms. Sacha alerted and indicated to the duffel bags containing the currency.

Mayo, Henkel, several other officers, and employees from the bank assisted in counting the seized money. Once the heat-sealed packaging was opened, the officers were able to smell the odor of raw marijuana emanating from the money. Officers performed field tests on money from several of the packages. Each sample tested positive for marijuana residue.

In addition to finding currency, officers found documents and papers in the RV. The evidence found in the RV was used to support applications for warrants to search other properties, including locations in Muscatine, Iowa and in Chicago, Illinois, a van found in an Iowa storage unit, and phones recovered from Defendant Melchior and found in the RV.

Defendants object to the stop and search of the RV, and to all subsequent searches of their properties, vehicles, and phones as fruit of the illegal traffic stop and RV search.

ANALYSIS

I.  Standing.

The Fourth Amendment guarantees citizens the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Defendants who move to suppress evidence based on an alleged Fourth Amendment violation have a threshold burden of showing a reasonable expectation of privacy in the area searched or the items seized. Rawlings v. Kentucky, 448 U.S. 98, 104–05 (1980); Rakas v. Illinois, 439 U.S. 128, 143 (1978); Katz v. United States, 389 U.S. 347, 361 (1967).

On the issue of standing, the Government has conceded:

1)  Both Defendants have standing to contest the validity of the stop.

2)  Defendant Melchior, as the owner and operator of the RV, has standing to contest the RV search.

3)  Both Defendants have standing to object to the search of the residence in Chicago.

4)  Defendant Melchior has standing to object to the search of the storage unit in Muscatine, Iowa.

5)  Defendant Brennan, as the owner, has standing to object to the search of the van located in the Iowa storage unit.

(Filing No. 76 at CM/ECF p. 3; Filing No. 101 at CM/ECF p. 16). The only contested standing issue is whether Defendant Brennan has standing to object to the search of the RV.

Factors relevant to determining standing include ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence

or nonexistence of a subjective expectation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994). To challenge the search of a vehicle, a defendant who neither owned nor rented the vehicle must "present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995).

Melchior was the owner and driver of the RV stopped on February 18, 2016. Although Brennan was not an owner of the RV, as reflected in the RV's insurance policy (See Exh. 117), she was an insured "driver" and "regular operator," indicating she had ongoing permission from the owner to use and operate the vehicle. Accordingly, the court finds Defendant Brennan had standing. See United States v. Rose, 731 F.2d 1337, 1343 (8th Cir. 1984) (holding vehicle passenger had standing to object to a search where he had permission from the owner to use and operate the vehicle).

    II.    <u>Validity of Stop and Search</u>.

A traffic stop is legal if it is supported by probable cause to believe that a law violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. This is true even if a valid traffic stop is a pretext for other investigation." United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted). A traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (quoting United States v. Chatman, 119 F.3d 1335, 1339-40 (8th Cir. 1997)). An officer's subjective motivations for a stop are not relevant where a traffic violation has occurred. Long, 532 F.3d at 795.

9

Following a vehicle more closely than is "reasonable and prudent" is a violation of Nebraska law. Neb. Rev. Stat. § 60-6, 140. And an officer can lawfully stop a vehicle for traveling too closely even if the officer intends to issue only a warning ticket. See United States v. Neumann, 183 F.3d 753, 755 (8th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998).

Mayo first observed the RV driving 60 miles an hour and following a vehicle at a timed distance of only 0.75 seconds. And after he ran the RV's license plates and decided to stop it, he saw the RV following a semi at a timed distance of only .59 seconds while traveling approximately 70 miles per hour. The Nebraska Driver's Manual Guidelines provides a three-second guideline for following other vehicles. This rule is consistent with the guidelines of at least 38 other states. (Filing No. 96 at CM/ECF pp. 91–92). Under the facts presented, Mayo had probable cause to stop Defendants' vehicle.

Defendants argue Mayo would not have stopped the RV but for the California license plate. Even if true, Mayo's subjective motivation, including his decision to stop Defendants' RV but ignore violations committed by other drivers, is irrelevant. Mayo's observation of the RV following another vehicle too closely provided probable cause for the stop.

Once a stop is initiated, "it should last no longer than is necessary to dispel the officer's suspicions." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (citing United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)). "[A] reasonable investigation of a traffic stop may include . . . requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose" of the trip. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v. Richards, 967 F.2d 1189, 1193 (8th Cir. 1992)). And an officer

may verify the information provided by the driver by questioning other occupants of the vehicle. United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000) (citing United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995)). A reasonable stop may also include completing "a number of routine but somewhat time-consuming tasks[,]" including "checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." United States v. Barragan, 379 F.3d 524, 528–29 (8th Cir. 2004). Once this initial investigation and the purpose of the stop are complete, further detention is unreasonable, "'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention'" United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting Jones, 269 F.3d at 925). Requesting consent to search after the purpose of a stop has concluded does not violate the Fourth Amendment. Long, 532 F.3d 791 at 795.

Melchior sat in the patrol vehicle as Mayo completed a warning ticket. While Mayo was checking on the vehicle's registration and on Melchior's driver's license and criminal history, he asked about Melchior's trip and its purpose. Mayo also spoke briefly with Brennan about the purpose and length of the trip. The stories did not match. Mayo returned to the cruiser and completed the stop by issuing a warning. He then requested and received consent to ask additional questions and thereafter requested consent to search the vehicle. The span from the time of the stop to issuing the warning was approximately 17 minutes. Mayo did not delay in completing the tasks needed to issue the warning ticket, and he did not perform or ask questions beyond the scope permitted by law during that time frame.

"[O]nce an officer finishes the tasks involved with the traffic violation the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention or unless the continued

11

encounter is consensual." United States v. Englehart, 811 F.3d 1034, 1041 (8th Cir. 2016)(internal quotations omitted).[3] "A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing," and, unlike a routine check of a driver's license or insurance card, conducting a dog sniff is not "an ordinary incident of a traffic stop." Rodriguez v. United States, _ U.S. _, 135 S.Ct. 1609, 1615 (2015) (internal quotation omitted). Therefore an officer who has stopped a driver for a traffic-related violation may not extend the stop for a dog sniff "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id.

Reasonable suspicion exists if the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[s] suspicion that a crime [is] being committed." United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998)(citations omitted). The court looks to the totality of the circumstances when determining whether reasonable suspicion exists.. Id. "[B]oth innocent and criminal acts can create reasonable suspicion." United States v. Juvenile TK, 134 F.3d 899, 903 (8th Cir. 1998) (citing United States v. Sokolow, 490 U.S. 1, 9 (1989)). Whether certain acts contribute to a finding reasonable suspicion is determined by viewing them in light of the law enforcement officer's experience and training. United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990)(internal citations omitted); Beck, 140 F.3d at 1136. However, the officer's suspicion cannot be based on a mere hunch or circumstances which "describe a very large category of presumably innocent travelers." Id. (citing Reid v. Georgia, 448 U.S. 438, 440–41 (1980)).

---

[3] Although Melchior may have initially consented to detention while a canine sniff occurred, he withdrew his consent before Deputy Henkel and Sacha started walking around the RV. (See Exh. 1 at 10:47:14–10:47:40). Therefore, the court finds Melchior did not consent to being detained during the dog sniff. The court must therefore decide whether reasonable suspicion of ongoing criminal activity was uncovered during the stop which supported further detention of Defendants during the canine sniff.

Mayo has approximately ten years of law enforcement experience, including three years assigned to a narcotics task force, and four years assigned to traffic enforcement and criminal interdiction. With this training and experience, Mayo considered multiple aspects of the traffic stop on February 18, 2016 suspicious, including:

> (1) Melchior's knowledge of forfeiture law, including his anticipation of being asked whether there was money in the RV. Mayo testified he rarely encounters motorists who are familiar with the law. Mayo generally believes the only people who have knowledge of law are police officers, lawyers, and criminals. He learned Melchior was not an officer or lawyer.
>
> (2) Inconsistent answers from Melchior and Brennan regarding the places traveled – Melchior told Mayo they had traveled to Michigan and then Florida while Brennan stated they traveled to only Indiana.
>
> (3) Melchior had two or more cell phones, including an inexpensive flip phone, on his person. Mayo knows from his training and experience that people involved in narcotics trafficking often carry multiple phones, especially inexpensive "burner" phones.
>
> (4) Melchior and Brennan were traveling to a location known as the Emerald Triangle, where large amounts of marijuana are produced. Mayo had recently been involved in two traffic stops involving the same location and both resulted in narcotics-related seizures.
>
> (5) Melchior provided contradictory answers regarding the ease of travel in an RV. When discussing the conveniences of traveling in an RV, Melchior contradicted Mayo by stating neither he nor Brennan preferred driving and that they stayed in motels and not in the RV. Based on these answers, Mayo could not understand why Melchior would choose to travel by RV. He also knew from his training that RVs are often used for transporting drugs and currency. ([Filing No. 96 at CM/ECF p. 174](#)).
>
> (6) Melchior appeared nervous and was often agitated throughout the stop.
>
> (7) The insurance and registration documents were packaged in heat-sealed plastic wrap consistent with packaging used for narcotics and currency.

13

(8) Melchior wore a safety reflective vest. Mayo believed Melchior was wearing it "to fit in" with other commercial drivers as he had never observed another RV driver wearing a similar vest.

Considered in the totality, these facts created a reasonable suspicion that Defendants were involved in criminal activity—likely drug trafficking. See e.g., United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009)(finding that extreme nervousness, multiple cellphones, and inconsistent stories generated reasonable suspicion); Jones, 269 F.3d at 929 (explaining that nervousness combined with other more revealing facts can generate reasonable suspicion); see also United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995)(finding that suspicious travel plans, inconsistent answers, and nervousness were sufficient to constitute reasonable suspicion).

### III.    Validity of Dog Sniff and Indication.

Defendants argue the dog in this case did not alert or indicate to the smell of narcotics from the RV, and even if the dog indicated, the indication was unreliable and must be disregarded.

If probable cause exists, an officer can lawfully search a vehicle without a warrant. United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007). "A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999)(collecting cases). To establish the dog's reliability, the evidence need only show the dog was trained and certified to detect drugs. Id. "[A] detailed account of the dog's track record or education" is not required to establish reliability. Id.

Defendant's expert, Andre Falco Jiminez , a former police officer and dog training expert, testified that Sacha did not indicate to the presence of narcotics because "there

14

was no time that would allow for a – a trained alert to occur." (Filing No. 96 at CM/ECF p. 12). Upon a close review of the video, Sacha's alert and indication behavior cannot be viewed due to the camera angle. Falco Jiminez is therefore unable to testify as to whether Sacha's behavior, as seen on the video recording, could be interpreted as an alert or an indication. And even if Sacha's behavior at the front driver's door was visible on the recording, it is unlikely the video and audio quality is sufficient to either verify or refute whether Sacha was "sniffing intensely" and taking in "deep nasal breaths."

Falco Jiminez' testimony challenges Henkel's credibility and the training and certification of Sacha as a drug dog. As to Henkel's testimony, the video recording depicts relatively steady movement around the vehicle, with quick sniffs by Sacha until Henkel stopped near the driver's side door on the second trip around the RV. Henkel and Sacha then remained at this spot for approximately 20 seconds before walking to the back of the RV and signaling the end of the search. (Exh. 1 at 10:49:03–10:49:26). To that degree, the video recording corroborates Henkel's testimony that Sacha alerted and indicated to the odor of narcotics at the driver's side door.

The undersigned magistrate judge finds Henkel credibly testified that Sacha alerted to the presence of drugs around the driver's side door during both the first and second passes around the vehicle, and then indicated to the presence of narcotics by sitting to looking at the location of the strongest odor, which is Sacha's trained indicating behavior.

Falco Jiminez claims, however, that Sacha's canine sniff was unreliable and cannot provide probable cause to search the RV because the search occurred too slowly and Sacha was not adequately trained. Falco Jiminez testified that Henkel spent too much time walking around the vehicle; that his slow pace caused Sacha to believe her handler wanted her to alert. He stated "at some point after two-and-a-half minutes, the dog will

15

just alert" and testified the dog sniff in this case lasted "well over four minutes." ([Filing No. 96 at CM/ECF p. 17](#)). As to the speed issue, Falco Jiminez' opinion is wholly undermined by the facts depicted in the video recording. From the time Henkel and Sacha began the sniff to the time Henkel signaled a thumbs-up was approximately 1 minute and 35 seconds. (See Exh. 1 at 10:47:54–10:49:27); significantly shorter the "over four minutes" which provides the basis for Falco Jiminez' opinion as to speed, and clearly within the two-and-a-half minute deadline to which he ascribes.

Falco Jiminez also challenges the training received by Sacha and Henkel, essentially claiming the canine training of every drug dog team certified through the Nebraska State Patrol is flawed and insufficient. For example, Falco states it is incorrect to train a dog to walk around a vehicle three times or to train a dog using uncirculated currency, (See [Filing No. 96 at CM/ECF pp. 22](#), 24, 36), while Dale Fellin, a canine training evaluator and instructor for NSP, states both are acceptable and ordinary practices. (See [Filing No. 96 at CM/ECF pp. 63](#)–64, 72). And since NSP follows Utah's drug dog program, Falco Jiminez' testimony calls into question the canine searches in Utah as well as every other state which follows Utah's canine training and certification model. The court notes that Falco Jiminez' current income is derived from owning and operating a canine training program and providing expert testimony for defendants in criminal or forfeiture cases. Falco Jiminez' opinion testimony as to the correct way—and perhaps the only correct way—to train and certify a drug dog was not credible.

Moreover, for the purposes of a Fourth Amendment analysis, the question is not whether Sacha is perfect at performing canine sniffs, or even whether Nebraska's canine training and certification program is appropriate or sufficient. Rather, the court must decide whether a reasonable officer in Henkel's position would believe Sacha was qualified to search for the odor of narcotics and that, as to Defendants' RV, she alerted and indicated to the odor of illegal drugs within that vehicle.

Henkel and Sacha have been a NSP certified drug dog team since 2012, and in accordance with NSP standards, they have been successfully tested and recertified every year since. In October of 2015, the date of Sacha's annual certification before the traffic stop at issue, Sacha received an overall "commendable"[4] score for searching and a "typical" (very nearly commendable) score for indicating. She scored "commendable" for both searching and indicating when tested on the exterior of vehicles. In addition to Henkel's personal involvement in, and knowledge of, this certification testing, he also trains with Sacha weekly and maintains Sacha's deployment records. Between March 26, 2015 and February 11, 2016, Sacha was deployed 42 times, and she indicated to the odor of narcotics 29 of these times. (Exh. 15). With the exception of one time, officers searched and always found illegal drugs or large amounts of currency following Sacha's indications.[5] (See Exh. 15). Given Sacha's training, certification, and deployment record, Henkel was reasonable in believing Sacha was qualified to search for the odor of illegal drugs, and that her indication was reliable and provided probable cause to search Defendants' RV.

Defendants' Fourth Amendment rights were not violated. There was probable cause to stop Defendants' vehicle, Defendants were not unlawfully detained, and there was probable cause to search the RV. Defendants' Fourth Amendment claims, including

---

[4] NSP scoring for drug dog teams is as follows:
1.00-1.74 Superior;
1.75-2.49 Commendable;
2.50-3.24 Typical;
3.25-4.00 Suitable;
4.01-5.00 Improvement Needed; and
5.01-6.00 Unsatisfactory. (Exh. 4).

[5] The court notes that even if drugs and/or money were not found on one occasion, that does not mean Sacha falsely indicated. Sacha is trained to detect the odor of illegal drugs, and that odor can linger even after the drugs are gone. Or the officers' search may not have found the drugs or tainted money actually present.

all claims to suppress the fruit of the traffic stop, detention, and search of the RV, should be denied

### IV. Statements.

Both Defendants seek to suppress statements allegedly made. (Filing No. 58 at CM/ECF pp. 22–23 ; Filing No. 74). Defendants argue statements should be suppressed under both the Fourth Amendment as fruits of an illegal stop, and under the Fifth Amendment as violations of Defendants' Miranda rights. For the reasons previously stated, Defendants' Fourth Amendment challenges to the statements should be denied. As to the Fifth Amendment arguments, the government states it is not aware of any custodial interrogation of either Defendant. (Filing No. 76 at CM/ECF p. 6).

A defendant must be advised of his or her Miranda rights before being subjected to law enforcement questioning while in custody. For the purposes of Miranda, detention during an ordinary traffic stop is not custodial. Berkemer v. McCarty, 468 U.S. 420, 440 (1984). As such, any questioning during the traffic stop and before Defendants were arrested was not custodial interrogation for which Miranda rights were required. And once the currency was found in the RV, Henkel handcuffed each defendant and advised them of their Miranda rights. (Exh. 1 at 11:01:43). Defendants' Fifth Amendment rights were not violated.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motions to suppress filed by the defendants (Filing Nos. 57 & 74) be denied in their entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before Richard G. Kopf, Senior United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on February 13, 2017 or as soon thereafter as the case may be called, for a duration of three (3) trial days. Jury selection will be held at the commencement of trial.

Dated this 17th day of January, 2017.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge